IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

AMBER PATTON,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )       Civil Action No. 7:16-cv-00250
                                       )
DAVID J. SHULKIN,                      )       By: Elizabeth K. Dillon
Secretary of Veterans Affairs,         )           United States District Judge
                                       )
        Defendant.                     )

**MEMORANDUM OPINION**

Plaintiff Amber Patton filed this action against the Secretary of Veterans Affairs, asserting claims

of disability discrimination and retaliation in violation of the Rehabilitation Act of 1973 (Rehabilitation

Act), 29 U.S.C. §§ 701–796.   The case is presently before the court on the Secretary's motion for

summary judgment.   The motion has been fully briefed, the court heard argument on the motion, and the

court has considered all of the written submissions, including the supplemental briefs filed after the

hearing.   For the reasons set forth below, the Secretary's motion for summary judgment will be granted

in part and denied in part.

## I.  FACTUAL BACKGROUND

Patton is a veteran of the United States Army.   She was honorably discharged in 2003.   (Def.'s

Br. Supp. Mot. Summ. J. (Def.'s Br.) Ex. 1, Dkt. No. 44-1.)   Following her honorable discharge, Patton

applied for and received disability benefits from the United States Department of Veterans Affairs (VA).

(*Id.*)   She received a combined disability rating of 70 percent based on two service-related conditions:

major depressive disorder and colitis.[1]   (*See* Pl.'s Br. Opp'n Mot. Summ. J. (Pl's Br.) Ex. B, Salem VA

---

[1]   Although the plaintiff's medical records reflect a diagnosis of colitis, the parties have also referred to her
intestinal impairment as "irritable bowel syndrome" or "IBS."

Medical Center (VAMC) Records at 86, Dkt. No. 69.)   She has also been diagnosed with post-traumatic stress disorder ("PTSD") and generalized anxiety disorder.   (*See, e.g.*, *id.* at 397, 452, 506.)

In the fall of 2012, Patton applied to work as a veterans service representative (VSR) at the VA's regional office in Roanoke, Virginia.   She was one of several individuals who received preferential treatment in the hiring process as a result of having a service-connected disability.   (Def.'s Br. Ex. 4, Dkt. No. 44-4.)   Keith Wilson, the director of the Roanoke regional office, authorized Patton's hiring in September of 2012, and she began working on a probationary basis on October 1.   (Patton Dep. 17, Dkt. No. 44-2;[2] Wilson Decl. ¶ 3, Dkt. No. 44-25.)

As a VSR, Patton was responsible for reviewing and processing veterans' claims for benefits. (Pl.'s Br. Ex. F, Dkt. No. 65-6.)   Patton's direct supervisors were Justin Roberts and Neena Lorenzani. (Roberts Dep. 12, Dkt. No. 44-9; Lorenzani Equal Employment Opportunity (EEO) Aff. 4, Dkt. No. 44-16.)   Her supervisory chain of command also included William Barksdale, David Svirsky, Kathleen Sullivan, and Wilson.   Roberts, Barksdale, Sullivan, and Wilson each have an unspecified "disability." (Roberts EEO Aff. 4, Dkt. No. 44-15; Barksdale EEO Aff. 3, Dkt. No. 44-11; Sullivan EEO Interrog. 2, Dkt. No. 44-7; Wilson EEO Interrog. 2, Dkt. No. 44-10.)

As a benefit of her employment with the VA, Patton earned sick leave and annual leave at a set rate each pay period.   The regional office's policies and procedures concerning absences and leave are set forth in a circular entitled "Absence and Leave."[3]   (Def.'s Br. Ex. 19, Dkt. No. 44-19.)   The circular states that employees are responsible for "[r]equesting advance approval of annual leave and to the extent possible advance approval of sick leave for medical, dental or optical examinations or treatment." (*Id.* at 2.)   When sick leave is necessary due to a physical or mental illness, an employee must "notify

---

[2]   Both parties submitted excerpts of various depositions.   When citing to the depositions, the court will also provide citations to the electronic docket.

[3]   Although the circular postdates Patton's period of employment, both parties cite to the circular in their respective briefs.

the immediate supervisor or designee (or . . . have any responsible person make the notification for the employee) at the work site as soon as possible but no later than two hours after the employee is scheduled to report for duty unless mitigating circumstances exist." (*Id.* at 5.)

The circular also indicates that "[t]he use of accrued annual leave is an absolute right of the employee subject to the right of Management to approve when leave may be taken." (*Id*. at 3.) The same right is recognized in the Master Agreement between the VA and the American Federation of Government Employees. *See* Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees 188, VA Pamphlet 05-68 (Mar. 2011), available at https://www.va.gov/lmr/docs/agreements/afge/master_agreement_between_dva_and_afge-fin_ march_2011.pdf (last visited Mar. 12, 2018). The Master Agreement further provides that "[n]o approved leave or approved absence will be a basis for disciplinary action except when it is clearly established that the employee submitted fraudulent documentation or misrepresented the reasons for the absence," and that "[e]mployees will not be adversely affected in any employment decision solely because of their leave balances." (*Id*. at 187.)

Between October 1, 2012, and June 30, 2013, Patton used 61.25 hours of accrued sick leave and 87 hours of accrued annual leave. (Def.'s Br. Ex. 18, Dkt No. 44-18.) All of Patton's leave requests were approved by her supervisors. (Lorenzani Dep. 31, Dkt. No. 65-9.) None of her requests were the subject of an investigation for fraud or abuse. (*Id.*)

The record contains emails associated with some of Patton's leave requests. (*See* Def.'s Br. Ex. 20, Dkt. No. 44-20.) On a number of occasions, Patton personally emailed her supervisors and requested leave for medical appointments, including appointments at the Salem VA Medical Center. (*Id*. at 9, 14, 24, 27, 33, 35, 36, 38). Patton also requested time off for veterinary appointments, bereavement following the death of a family member, anticipated bad weather, and illness. (*Id.* at 12, 14, 18, 23, 30, 32, 34.) On three occasions between October 1, 2012, and June 30, 2013, one of Patton's

coworkers emailed her supervisors and advised them that Patton would not be at work. (*See id.* at 8 ("Amber wanted me to make sure you guys knew she was home sick today."); *id.* at 11 ("Amber asked that I remind you that she has Physical Therapy this morning and will be in when it is finished."); *id.* at 15 ("Amber has been trying to get in contact with you . . . . [S]he won't be able to make it in today, she has some personal things she is trying to care [of].").)

During her deposition, Patton testified that she often had to take leave as a result of the symptoms associated with her major depressive disorder, PTSD, and colitis. When asked how her PTSD and major depressive disorder affected her ability to work, Patton testified that she would experience an "uncontrollable urge to cry" and "have difficulty focusing." (Patton Dep. 196, Dkt. No 65-1.) Patton further testified that these disorders would interfere with her ability to interact with other people. (*Id.* at 200–01.) Patton confirmed that she either left work, or missed entire days of work, as a result of emotional distress, and emphasized that her symptoms were so severe at times that she was unable to get out of bed. (*Id.* at 196.) Although Patton did not refer to her specific diagnoses when requesting leave, she would let Lorenzani "know [what was] going on, and then [Lorenzani] approved [the leave request]." (Patton Dep. 68, Dkt. No. 44-2.)

Patton's intestinal disorder also interfered with her ability to work. Patton testified that she would experience "extreme bouts of diarrhea" while working for the VA and that she "could actually end up defecating on [herself]" if she were not close enough to a restroom. (Patton Dep. 197, Dkt. No. 65-1.) When Patton experienced the sudden onset of diarrhea, she would inform her supervisors in a manner in which "they understood [she] had to leave suddenly[.]" (*Id.* at 201.)

Records from the Salem VA Medical Center confirm that Patton was treated on an outpatient basis for depression, anxiety, and PTSD during her period of employment with the VA. The treatment included a psychotropic medication regimen and psychotherapy. (*See, e.g.*, Pl. Br. Ex. B., Salem VAMC Records at 452–55.)

On July 17, 2013, Justin Roberts completed Patton's first monthly progress review. (*See* Pl.'s Br. Ex. C, Dkt. No. 65-3.) Roberts was tasked with reviewing Patton's performance during the month of June and determining whether the following traits were "satisfactory": dependability, attendance, compliance with procedures and rules, cooperation with supervisors and fellow employees, accuracy of work, workload management, and quantity of work. (*Id.* at 1.) Roberts answered "yes" with respect to each trait and confirmed that Patton was "progressing satisfactorily." (*Id.*) Roberts also noted that Patton had exceeded the applicable production and quality standards for the month of June. (*Id.*; *see also* Pl.'s Br. Ex. F, Dkt. No. 65-6 (listing national performance goals for VSRs).)

At some point in July of 2013, management officials at the Roanoke regional office held the first of two biweekly meetings to discuss Patton and other probationary employees. The meetings were also attended by Patton's direct supervisors, Roberts and Lorenzani, and a human resources (HR) representative, Kevin Reynolds. (*See* Wilson EEO Interrog. 6; Reynolds Dep. 43, Dkt. No. 65-5.) During the meetings, the attendees reviewed Patton's existing performance and attendance records. (Wilson EEO Interrog. 8.) They also discussed the reasons for Patton's low leave balance, including the fact that many of her absences were "for illness or going to medical appointments" at the Salem VA Medical Center. (Reynolds Dep. 42, Dkt. No. 65-5; *see also id.* at 41, 46.) At the second meeting, which occurred during the third or fourth week of July, the decision was made to terminate Patton's employment. (*Id.* at 58, 96.) Wilson was responsible for making the final decision. (*Id.* at 56; *see also* Wilson Decl. ¶ 4.)

That same month, Patton informed Lorenzani that she was pregnant. On July 19, 2013, Patton emailed Lorenzani regarding an upcoming appointment with an obstetrician. (Def.'s Br. Ex. 20 at 5.) Lorenzani recommended that Patton return to work following the appointment, since time and attendance records were "being reviewed closely by others." (*Id.*)

On August 16, 2013, Patton received a termination letter from Wilson. The letter provided the following reason for her termination: "You are being terminated because you have failed to demonstrate your fitness for continued service with the Department of Veterans Affairs." (Def.'s Br. Ex. 22 at 1, Dkt. No. 44-22.)

Patton subsequently filed an EEO complaint challenging her termination. During the investigation of her complaint, Wilson provided a chart listing the amount of leave that Patton had used during each month of her employment. (Wilson EEO Interrog. 10.) Wilson indicated that Patton's leave records supported the conclusion that she did not possess the capacity to become a successful VSR. (*Id.*)

Wilson and other management officials have since testified that the termination decision was "premised upon undependability due to leave usage." (Wilson Dep. 75, Dkt. No. 65-7; *see also* Svirsky Dep. 63, Dkt. No. 65-11 (agreeing that "leave usage" was the primary reason for Patton's termination); Barksdale Dep. 21, Dkt. No. 65-8 (recalling that the discussions regarding Patton focused on "accrual and usage" of leave).) Wilson has also testified that "using leave on a regular monthly basis was not the issue"; instead, the issue was the "manner in which it was used," such as providing "short notice, no notice, that type of thing." (Wilson Dep. 39, Dkt. No. 44-14.)

Two other probationary employees, David Prewitt and Amanda Jones, were terminated in August of 2013. The record reveals that their terminations were for leave-related reasons. (*See* Sullivan EEO Interrog. 10 (responding that leave usage was high each month for all three probationary employees); Reynolds Dep. 32, Dkt. No. 44-5 (indicating that he did not recall Pruitt and Jones having any dependability issues other than leave usage).)

Prior to Wilson's term as director, management officials at the Roanoke regional office "primarily focused on quality and production." (Svirsky Dep. 63, Dkt. No. 65-11.) Wilson's focus on employee attendance represented "a change in approach." (*Id.*) At the time the decision was made to

terminate Patton's employment, her direct supervisors were not aware that the use of accrued leave could result in termination. (Lorenzani Dep. 50, Dkt. No. 65-9.) Accordingly, Patton was never advised that she could be terminated on that basis. (*Id.*)

After exhausting her administrative remedies, Patton filed the instant action under the Rehabilitation Act. In Count I of her complaint, Patton asserts that the VA unlawfully terminated her employment on the basis of her disabilities. In Count II, Patton claims that the VA failed to reasonably accommodate her disabilities. In Count III, Patton alleges that the VA retaliated against her for requesting an accommodation for her disabilities. In Count IV, Patton asserts a claim for disparate impact and treatment, based on an alleged practice of terminating probationary employees "who are disabled, and utilize leave to address health . . . needs related to those disabilities." (Compl. ¶ 48, Dkt. No. 1.)

On January 12, 2018, the Secretary moved for summary judgment on all four counts of the complaint. After receiving two extensions of time, Patton filed a response to the summary judgment motion on February 6, 2018.[4] In her response, Patton concedes that summary judgment is warranted as to Counts II and III of the complaint and with respect to the claim of disparate treatment asserted in Count IV.

The court held a hearing on the motion for summary judgment on February 15, 2018. At the conclusion of the hearing, the court permitted the parties to file supplemental briefs relevant to Patton's disparate-impact claim asserted in Count IV. The motion for summary judgment is now ripe for review.

---

[4] Patton's response was filed approximately twenty minutes after the extended deadline. Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure allows the court to extend the time to file "on motion made after the time has expired if the party failed to act because of excusable neglect." Excusable neglect is "at bottom an equitable [inquiry], taking account of all relevant circumstances," including: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Under the circumstances presented, the court finds that the relevant factors militate in favor of permitting the untimely filing. Accordingly, the court declines to strike Patton's brief in opposition to the Secretary's motion or the exhibits referenced therein.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A genuine issue of material fact exists when a rational trier of fact, considering the evidence in the record as a whole, could find in favor of the non-moving party.   *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'"   *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).   Stated differently, summary judgment should be entered if the court finds, after a review of the record as a whole, that no reasonable jury could return a verdict for the non-moving party.   *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).

### B.   Analysis

Section 504 of the Rehabilitation Act makes it unlawful for a federal agency to discriminate against "a qualified individual with a disability . . . solely by reason of her or his disability."   29 U.S.C. § 794(a).   "Employment discrimination claims brought under Section 504 are evaluated using the same standards as those 'applied under [T]itle I of the Americans with Disabilities Act of 1990.'"   *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 413 (4th Cir. 2015) (quoting 29 U.S.C. § 794(d)).   Of significance here, Title I of the Americans with Disabilities Act (ADA) prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . ."   42 U.S.C. § 12112(a).

The Supreme Court has consistently distinguished between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact.   *Raytheon Co. v.*

*Hernandez*, 540 U.S. 44, 52 (2003). In this case, Patton asserts claims of discrimination under both theories of liability. The court will address each claim in turn.

1. **Genuine issues of material fact preclude the entry of summary judgment on the plaintiff's disparate-treatment claim.**

"Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision." *Id.* Absent direct evidence of intentional discrimination, disparate-treatment claims under the Rehabilitation Act are evaluated using the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973). *See Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id.* If she succeeds, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Once the defendant proffers a justification for the action at issue, "the burden shifts back to the plaintiff to 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not [the] true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The plaintiff's initial burden is "not onerous." *Burdine*, 450 U.S. at 253. To establish a prima facie case of discrimination under the Rehabilitation Act, Patton must show that: (1) she has a disability; (2) she is otherwise qualified for the employment in question; and (3) she was excluded from that employment due to discrimination solely on the basis of her disability. *Reyazuddin*, 789 F.3d at 418 (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995)).

The Secretary argues that Patton is unable to satisfy any of the elements of her prima facie case. For the reasons that follow, the court disagrees and concludes that Patton has presented evidence sufficient to support each element.

a. *A reasonable jury could find that Patton is disabled.*

The Secretary first argues that Patton does not have a disability within the meaning of the Rehabilitation Act. The Rehabilitation Act incorporates the ADA's definition of the term "disability." *See* 29 U.S.C. § 705(9)(B). Under the ADA, "[t]he term 'disability' means with respect to an individual— (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The term "major life activities" is defined to include, among others, "concentrating, thinking, communicating, and working," as well as "the operation of a major bodily function," including the functions of the "digestive" system, "bowel," and "brain." *Id.* § 12101(2). The Equal Employment Opportunity Commission has also identified "interacting with others" as a major life activity. 29 C.F.R. § 1630.2(i)(1)(i).

In 2008, "Congress broadened the definition of 'disability' by enacting the ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 . . . ." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). "The ADA Amendments Act (ADAAA) was intended to make it 'easier for people with disabilities to obtain protection under the ADA.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.1(c)(4)). Its implementing regulations clarify that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether the discrimination has occurred, not whether the individual meets the definition of a disability." 29 C.F.R. § 1630.1(c)(4). Accordingly, "'[t]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Jacobs*, 780 F.3d at 572 (quoting Pub. L. No. 110-325, § 2(b)(5) (2008)).

In this case, Patton claims that she is actually disabled within the meaning of the ADA. In particular, Patton maintains that she has "qualifying disabilities of Major Depressive Disorder with

anxiety, PTSD) and colitis / IBS."[5]   (Pl.'s Br. 4.)   Although Patton receives disability benefits

from the VA based on two of these impairments, she acknowledges that her service-related disability

rating is not dispositive.   (*Id.* at 7); *see also Bowers v. United States Postal Serv.*, No. 17-1259, 2017

U.S. App. LEXIS 22837, at *4 (6th Cir. Nov. 13, 2017) ("The mere fact that Bowers is a 'disabled

veteran' is insufficient to establish that he suffers from a disability for purposes of the Rehabilitation Act

or the ADA.") (collecting cases).   Instead, she argues that her mental and intestinal impairments

"substantially limit one or more major life activities, including sleeping, communicating, and working,"

and thus qualify as disabling within the meaning of the ADA.   (Pl.'s Br. 4.)

  The Secretary initially argues that there is insufficient evidence to establish that Patton suffered

from each of the identified impairments during her period of employment with the VA.   Having

reviewed the record, the court disagrees.   Treatment records from the Salem VA Medical Center reflect

diagnoses of major depressive disorder, PTSD, anxiety, and colitis.   Such evidence suffices to establish

a genuine dispute of material fact with respect to this issue.

  The Secretary also argues that none of Patton's claimed impairments substantially limit any

major life activity.   To support this argument, the Secretary relies on several pre-ADAAA cases.

"Prior to the ADAAA, a plaintiff seeking to prove disability needed to show that she was 'significantly

restricted' in a major life activity."   *Jacobs*, 780 F.3d at 573.   "The ADAAA expressly rejected this rule

as imposing 'too high a standard.'"   *Id.* (quoting Pub. L. No. 110-325 § 2(a)(8)).   To be considered

substantially limiting, "[a]n impairment need not prevent, or significantly or severely restrict, the

---

[5]   While the record reveals that Patton was pregnant at the time of her termination, she does not claim that her pregnancy constituted a disabling impairment.   Nonetheless, the court notes that "[w]ith near unanimity, federal courts have held that pregnancy [alone] is not a 'disability' under the ADA."   *Saah v. Thumel*, No. 1:15-cv-02425, 2017 U.S. Dist. LEXIS 17015, at *18 (D. Md. Feb. 7, 2017) (alterations in original) (citations omitted).   "Although the 2008 amendments broadened the ADA's definition of disability, these changes have had only a modest impact when applied to pregnancy-related conditions."   *Love v. First Transit, Inc.*, No. 1:16-cv-02208, 2017 U.S. Dist. LEXIS 37716, at * (N.D. Ill. Mar. 16, 2017) (citations omitted).   The EEOC's interpretative guidance "continues to state—even after the ADAAA—that 'conditions, *such as pregnancy*, that are not the result of a physiological disorder are also not impairments.'"   *Id.* (emphasis in original) (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(h)).   "Furthermore, the EEOC's post-ADAAA enforcement guidelines on pregnancy discrimination continue to advise that 'pregnancy itself is not an impairment within the meaning of the ADA, and thus is never on its own a disability.'"   *Id.* (quoting EEOC No. 915-003, Enforcement Guidance: Pregnancy Discrimination and Related Issues, 2015 WL 4162723, at *19 (June 25, 2015)).

individual from performing a major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). Instead, it need only "substantially limit[] the ability to perform a major life activity as compared to most people in the general population." *Id*. This comparison "usually will not require scientific, medical, or statistical analysis." *Id.* § 1630.2(j)(1)(v). Moreover, the determination of whether an impairment substantially limits a major life activity must be made "without regard to the ameliorative effects of mitigating measures," *id.* § 1630.2(j)(1)(vi), and where an impairment is "episodic or in remission," the assessment turns on whether it "would substantially limit a major activity when active," *id.* § 1630.2(j)(1)(vii).

Given these directives, the court concludes that Patton has offered sufficient evidence to create a genuine dispute of material fact as to whether her impairments substantially limit one or more major life activities. Two of her diagnosed impairments—major depressive disorder and PTSD—are included in the regulations' list of impairments that "should easily be concluded" to substantially limit brain function. *Id.* § 1630.2(j)(3)(iii). Moreover, during her deposition, Patton provided detailed examples of how her mental and intestinal impairments affected her ability to work.[6] For instance, Patton testified that her major depressive disorder and PTSD caused her to experience an uncontrollable urge to cry, made it difficult for her to focus, and negatively affected her ability to interact with others. Patton further testified that her intestinal disorder resulted in the sudden need for bowel activity and that she experienced bouts of diarrhea at work that were so severe that she could actually end up soiling herself if she were not close enough to a restroom. In light of such evidence, the court concludes that a reasonable jury could easily find that Patton's mental and intestinal impairments substantially limit one or more major life activities and are therefore disabling for purposes of the ADA and the Rehabilitation

---

[6] Contrary to the Secretary's argument, Patton's deposition testimony was not inconsistent with the information she provided during the investigation of her EEO complaint. Although Patton indicated that her disabilities do not substantially limit a major life activity, the investigator specifically defined such activity to include "breathing, seeing, hearing, [and] walking." Patton EEO Aff. 6, Dkt. No. 44-3. Notably, the investigator did not advise her of the complete statutory definition. Nor did he specifically inquire as to whether her impairments substantially limit her ability to work or substantially affect the operation of a major bodily function.

Act.[7]  *See Jacobs*, 780 F.3d at 574 (concluding that the plaintiff's "testimony that working the front

counter caused her extreme stress and panic attacks create[d] a disputed issue of fact on this issue"); *see*

*also Williams v. Tarrant Cty. Coll. Dist.*, No. 16-11804, 2018 U.S. App. LEXIS 1196, at *14–15 (5th

Cir. Jan. 18, 2018) (holding that a plaintiff's sworn declaration detailing her diagnoses, treatments, and

symptoms was sufficient to withstand summary judgment and that the district court erred in requiring

medical corroboration).

      b.   *A reasonable jury could find that Patton was able to perform the essential*
            *functions of her position.*

      The court turns next to the second element of the prima facie case: whether Patton has shown that

she was qualified for the employment in question.  *See Reyazuddin*, 789 F.3d at 418.  A "qualified

individual" is one "who, with or without a reasonable accommodation, can perform the essential

functions of the employment position that such individual holds or desires."  *Id.* at 414 (citing 42 U.S.C.

§ 12111(8)).  The Secretary argues that Patton is unable to satisfy this element since she "failed to

'perform perhaps the most essential function of all—regularly showing up for work.'"  (Def.'s Br. 15

(quoting *Vanyan v. Hagel*, 9 F. Supp. 3d 629, 638 (E.D. Va. 2014).)

      The determination of whether an individual is qualified for a position must be made on a

case-by-case basis.  *Champ v. Baltimore Cty.*, 884 F. Supp. 991, 996 (D. Md. 1995).  Generally

speaking, an employee cannot perform the essential functions of her job without maintaining a regular

and reliable level of attendance.  *See Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 212 (4th Cir. 1994).

"While legal authority supports this common-sense conclusion, no legal authority establishes any

specific attendance requirements for government or private sector jobs."  *Carlson v. Inacom Corp.*, 885

F. Supp. 1314, 1320 (D. Neb. 1995) (citing *Walders v. Garrett*, 765 F. Supp. 303, 310 (E.D. Va. 1991),

*aff'd*, 956 F.2d 1163 (4th Cir. 1992)).  "Instead, the necessary level of attendance and regularity is a

---

      [7]  Inasmuch as genuine issues of material fact exist as to whether Patton has a mental or physical impairment that
substantially limits one or more major life activities, the court need not consider whether a reasonable jury could find that
Patton had a record of such an impairment or was regarded as having such an impairment.  *See* 42 U.S.C. § 12102(1).

question of degree depending on the circumstances of each position." *Walders*, 765 F. Supp. at 310 (citations omitted); *see also Fischer v. Pepper Hamilton LLP*, No. 2:15-cv-02413, 2016 U.S. Dist. LEXIS 10603, at *31 (E.D. Pa. Jan. 29, 2016) (observing that "the inquiry into whether regular attendance constitutes an essential function of a job depends in large part on the nature of the job itself") (emphasis omitted).

In *Tyndall*, the United States Court of Appeals for the Fourth Circuit held that the plaintiff's frequent absences rendered her unable to function effectively as a teacher at a business college. 31 F.3d at 213. In reaching this decision, the court emphasized that the plaintiff "held a job that could not be performed away from the [college] campus," and that "her position required that she teach the assigned courses during the scheduled class times and spend time with her students." *Id.* "Despite this obvious need for regular attendance, Tyndall missed almost forty days of work during a seven-month period." *Id.* She also "missed the beginning of an instructional cycle twice in a row and requested permission to be absent for yet a third time, even though the start of an instructional period is a crucial time for [the college's] operations." *Id.* In light of such evidence, the court held that the plaintiff's attendance issues rendered her unable to fulfill the essential functions of her teaching position. *Id.* at 214.

The court finds the facts of *Tyndall* and other decisions cited by the Secretary to be distinguishable from those in the instant case. First, a reasonable jury could find that Patton was not excessively absent from work. Between October 1, 2012, and June 30, 2013, Patton used a total of 148.25 hours (or approximately 18 days) of accrued leave. While this amount of leave is not insubstantial, it is far less than the amount taken by employees in *Tyndall* and other cases involving excessive absenteeism. *See id.*; *see also Works v. Berryhill*, 686 F. App'x 192, 197 (4th Cir. 2017) (holding that the plaintiff's excessive absenteeism rendered her unable to perform the essential functions of her job where the plaintiff missed more than seven weeks of work during a fifty-week probationary period); *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999) (noting that the plaintiff took two

medical leaves of absence during a twenty-month period, one of which lasted approximately five months, and that she missed work or was late for work on forty other occasions); *Walders*, 765 F. Supp. at 306 (emphasizing that "including the annual and sick leave which [plaintiff] almost invariably exhausted, plaintiff missed work for all or part of more than sixty days per year, and probably much closer to 90 days").

Second, while the Secretary has proffered testimony indicating that "frequent occurrences of unplanned leave . . . *could possibly* impact [a team's] ability to make [its] production requirements," (Roberts Dep. 87, Dkt. No. 44-9 (emphasis added)), the Secretary has not cited any evidence establishing that Patton's absences actually resulted in work not being performed in a timely and efficient manner. *See Carlson*, 885 F. Supp. at 1320 (finding that the plaintiff was qualified for the employment in question despite his attendance record where the defense presented no evidence that the plaintiff's unscheduled absences were unduly disruptive). To the contrary, the record reveals that Patton exceeded the monthly production and quality standards in June of 2013, despite taking 17.25 hours of sick leave.

Finally and perhaps most importantly, Patton's supervisor had the opportunity to document any leave or attendance issues when he completed her progress report for the month of June. Despite being fully aware of her rate and pattern of unscheduled leave, Patton's supervisor nonetheless indicated that her performance was satisfactory in all areas, including dependability, attendance, and compliance with procedures and rules. *Compare Pettus v. Am. Safety Razor Co.*, No. 5:99-cv-000103, 2001 U.S. Dist. LEXIS 6968, at *12–14 (W.D. Va. Mar. 29, 2001) (Michael, J.) (concluding that the plaintiff produced sufficient evidence to support her argument that she was qualified for the position in question where the defendant found the plaintiff's performance satisfactory and worthy of bonuses despite knowing that she had a considerable number of absences), *with Works*, 686 F. App'x at 197 (observing that the plaintiff's supervisor "consistently and repeatedly stated that her primary concern was [the plaintiff's] inability to

complete assigned tasks," and that the plaintiff's "failure to report to work on a reliable basis directly contributed to her inability to perform her job duties").

Based on the foregoing evidence, a reasonable jury could find that Patton's use of leave did not preclude her from performing the essential functions of the VSR position and that she was otherwise qualified for the employment in question.

      c.   *A reasonable jury could find that Patton was terminated solely on the basis of her disabilities.*

The court also concludes that disputed issues of material fact exist with respect to the third element of the prima facie case—causation. In analogous cases under the ADA, courts have held that "a plaintiff sufficiently alleges that the plaintiff's termination was based on the plaintiff's disability where a plaintiff's absenteeism is caused by a known disability and the plaintiff is terminated based on absenteeism." *Alejandro v. ST Micro Elecs., Inc.*, 129 F. Supp. 3d 898, 909 (N.D. Cal. 2015); *see also Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001) (concluding that a jury could reasonably find the requisite causal link between the disability at issue and the plaintiff's absenteeism and conclude that the plaintiff was fired because of her disability). In this case, the Secretary argues that Patton is unable to establish the requisite causal link because her "supervisors simply did not know that she had a disability." (Def.'s Reply Br. 8, Dkt. No. 67.) For the following reasons, the court finds the Secretary's argument unpersuasive at this stage of the proceedings.

Because the Rehabilitation Act prohibits discrimination "solely by reason" of an individual's disability, 29 U.S.C. § 794(a), courts have "agreed that for this causal link to be shown the employer must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability." *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897 (D.C. Cir. 1998). Accordingly, "the plaintiff must establish, as an element of . . . her prima facie case, that the defendant knew or believed that the plaintiff was disabled, or knew of the plaintiff's symptoms that were caused by the disability." *Burns v. City of*

*Columbus*, 91 F.3d 836, 844 (6th Cir. 1996). In discussing the ADA's causation requirement, courts have emphasized that "liability for disability discrimination does not require professional understanding of the plaintiff's condition," *Sanglap v. Lasalle Bank, F.S.B.*, 345 F.3d 515, 520 (7th Cir. 2003), or that an employer comprehend the legal significance of the underlying facts. *See Jacobs*, 780 F.3d at 575 (citing *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)). Instead, "it is enough to show that the defendant knew of symptoms raising an inference that the plaintiff was disabled." *Sanglap*, 345 F.3d at 520; *see also Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 920, 934 (7th Cir. 1995) (acknowledging that "it may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability").

The record before the court reveals that Wilson and other management officials knew that Patton had some form of service-related disability. According to the deposition testimony, however, their knowledge was not limited to the fact that Patton was entitled to the civil service preference afforded to disabled veterans. Patton testified that she frequently experienced symptoms related to her mental and intestinal impairments after she began working for the VA and that she would let her supervisors "know [what was] going on" when she had "a bout or an episode." (Patton Dep. 68, Dkt. No. 44-2.) Patton further testified that when her symptoms flared at work, she would inform her supervisors in a manner in which "they understood [she] had to leave suddenly[.]" (Patton Dep. 201, Dkt. No. 65-1.) Additionally, the HR representative testified that the reasons for Patton's absences were considered during the meetings leading up to her termination, and that the attendees specifically discussed the fact that Patton regularly used leave for illnesses and to receive medical treatment at the Salem VA Medical Center. Drawing all reasonable inferences in Patton's favor, a reasonable jury could find that Wilson and the other management officials knew or believed that Patton was disabled, or acted with knowledge of her disabling symptoms. *See Burns* at 844; *see also Preeson v. Parkview Med. Ctr.*, No. 15-cv-02263, 2017 U.S. Dist. LEXIS 47948, at *34 (D. Colo. Mar. 30, 2017) (finding that the evidence

on summary judgment was sufficient to indicate an employer's knowledge of the disabling symptoms of the plaintiff's impairment, even if the employer was not aware of the precise diagnosis).

The court must also reject the Secretary's argument that the same-actor inference precludes a finding that Patton was terminated solely on the basis of her disabilities. This inference of nondiscrimination applies to claims of disability discrimination when "the person responsible for terminating [an employee] . . . is the same person who hired [the employee] with *full knowledge of her disability*." *Tyndall*, 31 F.3d at 215 (emphasis added); *see also id.* (noting that "Seay not only hired Tyndall, but actively encouraged her to apply for the teaching position at Kee, despite having full knowledge of her lupus condition"). Viewing the evidence in the light most favorable to Patton, a reasonable jury could find that Wilson did not have "full knowledge" of Patton's disabilities at the time she was hired. *Id.* Indeed, the Secretary's own evidence indicates that Wilson was not aware of the nature or extent of Patton's impairments at the time he approved her hiring. (*See* Wilson Decl. ¶ 5 ("When hiring new employees, VARO receives a certification of eligible candidates to interview. This certification notes whether any candidate has a preference, including that for a service-connected disability. *No further information about the disability is provided in the certification other than this notation . . . .*") (emphasis added).) Accordingly, the Secretary's reliance on the same-actor inference is unavailing at this stage of the proceedings. *See*, *e.g.*, *Morissette v. Cote Corp.*, 190 F. Supp. 3d 193, 209 (D. Me. 2016) (concluding that the parties' conflicting versions regarding whether the employer was informed of the plaintiff's stroke history during his job interview precluded the application of the same-actor inference on summary judgment).

The same is true for the Secretary's reliance on the fact that some of Patton's supervisors have some form of disability. Succinctly stated, the mere fact a decision maker may also be a member of the same protected class as the plaintiff does not preclude a successful discrimination claim. *See*, *e.g.*, *Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 711 (D.S.C. 2014) (acknowledging that "the fact

that some of the individuals who allegedly discriminated against Plaintiff are the same race as the Plaintiff is not a dispositive fact when determining whether discrimination occurred").

For these reasons, the court concludes that Patton has presented sufficient evidence to create a genuine issue of material fact as to each of the elements required to establish a prima facie case of discrimination based on disparate treatment.

>    d.   *A reasonable jury could find that the proffered reason for Patton's termination is mere pretext for disability discrimination.*

Under the *McDonnell Douglas* framework, the burden shifts to the Secretary to produce evidence of a legitimate, non-discriminatory reason for terminating Patton.   *See Abilt*, 848 F.3d at 315.   Relying on the deposition testimony of Wilson and others, the Secretary maintains that Patton was terminated "due to her unsuitability for the position" in light of the manner in which she used and requested leave. (Def.'s Br. 15.)   For purposes of the pending motion, the court concludes that Secretary has satisfied his "relatively modest burden."   *Jacobs*, 780 F.3d at 575.

The burden therefore shifts back to Patton to prove that the asserted justification for her termination is pretextual.   *Abilt*, 848 F.3d at 315.   A plaintiff can establish pretext by showing that the employer's "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of . . . discrimination."   *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256).   "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

Viewing the record in the light most favorable to Patton, the court concludes that a reasonable jury could find that the asserted justification for her termination is unworthy of credence.   During the EEO process, Wilson stated that the number of "hours each month [that Patton was] not at work" indicated that she "did not possess the character traits or capacity to become a successful VSR."

(Wilson EEO Interrog. 8.)   Similarly, Wilson initially testified during his deposition that the termination decision was premised upon "the usage of leave in terms of dependability."   (Wilson Dep. 31, Dkt. No. 65-7; *see also id.* at 75.)   Wilson later testified, however, that "using leave on a regularly monthly basis was not the issue."   (Wilson Dep. 39, Dkt. No. 44-14.)   Instead, "[t]he issue was the manner in which leave was used."   (*Id.*)   While the justifications offered by Wilson may be only slightly inconsistent, none were mentioned at the time of Patton's termination.   Additionally, and even more importantly, no one in Patton's supervisory chain documented any problems with Patton's attendance prior to the termination decision or suggested that she was undependable due to her rate or pattern of leave usage. To the contrary, the only existing performance review was entirely positive, with satisfactory ratings in all categories, including attendance and dependability.   Drawing all reasonable inferences in Patton's favor, a reasonable jury could find that the defendant's "undocumented and uncorroborated justifications are pretextual and were not the actual reason for [her] termination."   *Jacobs*, 780 F.3d at 576.

A plaintiff may also establish pretext by demonstrating that an employer "acted contrary to a written company policy, an unwritten company policy, or a company practice when making the adverse employment decision affecting the plaintiff."   *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks and citation omitted).   Viewing the record in the light most favorable to Patton, a rational jury could find that Wilson failed to follow the VA's own policies pertaining to the use of leave, thereby giving rise to an inference of pretext.   (*See, e.g.,* Master Agreement at 187 ("No approved leave or approved absence will be a basis for disciplinary action except when it is clearly established that the employee submitted fraudulent documentation or misrepresented the reasons for the absence . . . . Employees will not be adversely affected in any employment decision solely because of their leave balances.").)

In sum, the court concludes that Patton has adduced sufficient evidence of pretext to survive summary judgment on her disparate-treatment claim. Accordingly, the Secretary's motion will be denied with respect to Count I.

### 2. Patton's disparate-impact claim is not supported by sufficient evidence.

Patton also asserts a claim of discrimination based on the disparate-impact theory of liability. The Supreme Court has explained that "disparate-impact claims 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Raytheon*, 540 U.S. at 52 (quoting *Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

Unlike Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3, neither the Rehabilitation Act nor the ADA uses the phrase "disparate impact."[8] Nonetheless, the Supreme Court has held that "disparate-impact claims are cognizable under the ADA." *Id.* The Court based its decision on the following subsections of the statute: 42 U.S.C. § 12112(b)(3), which defines "discriminate" to include "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability"); and 42 U.S.C. § 12112(b)(6), which defines "discriminate" to include "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." *Id.* Because the Rehabilitation Act incorporates the standards set forth in Title I of the ADA, courts have held that disparate-impact claims are also cognizable under the Rehabilitation Act. *Anderson v.*

---

[8]  "As originally enacted, Title VII did not expressly prohibit employment practices that cause a disparate impact." *Lewis v. City of Chicago*, 560 U.S. 205, 211 (2010). However, in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), the Supreme Court interpreted § 2000e-2(a)(2) to "proscrib[e] not only overt discrimination but also practices that are fair in form, but discriminatory in operation." "Two decades later, Congress codified the requirements of the 'disparate impact' claim *Griggs* had recognized." *Lewis*, 560 U.S. at 212 (citing Pub. L. 102-166, § 105, 105 Stat. 1071, 42 U.S.C. § 2000e-2(k)). The provision states that "[a]n unlawful employment practice based on disparate impact is established under this subchapter only if . . . a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity . . . ." 42 U.S.C. § 2000e-2(k).

*Duncan*, 20 F. Supp. 3d 42, 53 (D.D.C. 2013); *see also Hale v. Johnson*, 245 F. Supp. 3d 979, 986 (E.D. Tenn. 2017) (noting that "several other courts have affirmatively held that disparate impact claims are cognizable under the Rehabilitation Act") (collecting cases).

As previously stated, Patton alleges that the VA's "policy or practice in 2013 of terminating employees with a pattern of using approved, earned leave . . . disparately impacted disabled employees like herself who used leave to accommodate disabilities." (Pl.'s Br. 19.) In moving for summary judgment on this claim, the Secretary argues that the claim fails because it is not supported by statistical evidence sufficient to show that the alleged practice operated to discriminate against disabled employees. The Secretary alternatively argues that even if Patton could establish a prima facie case of disparate-impact discrimination, he has rebutted that case with evidence that the alleged practice was justified by business necessity. (*See* Def.'s Reply Br. 10.)

In the Title VII context, the Fourth Circuit has explained that the policy or practice contemplated by the disparate-impact doctrine "consists of 'more than the mere occurrence of isolated or . . . sporadic discriminatory acts, having reference instead to an employer's standard operating procedure." *Wright v. Nat'l Archives & Records Serv.*, 609 F.2d 702, 711 (4th Cir. 1979) (citation and internal quotation marks omitted). Thus, "[t]o establish a prima facie case of disparate impact discrimination under Title VII, a plaintiff must 'show that the facially neutral employment practice had a *significantly* discriminatory impact.'" *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005) (emphasis added) (quoting *Walls v. City of Petersburg*, 895 F.2d 188, 191 (4th Cir. 1990)). Ordinarily, this showing requires statistical evidence. *Id.*; *see also Wright*, 609 F.2d at 712 ("While we quite agree that an individual may, in appropriate circumstances establish without elaborate statistical proof a disparate impact Prima facie case, we cannot agree that the doctrine can fairly be applied to a situation such as that one here where the total set of affected persons is so small, the protected group is

numerically dominant in the total set, and the adverse 'impact' is finally experienced by only one of the numerically dominant group.").

Although the Fourth Circuit has not addressed whether a plaintiff must present statistical evidence to establish a prima facie case of disparate-impact discrimination under the ADA or the Rehabilitation Act, a number of courts have held that such evidence is typically required. For instance, in *B.C. v. Mount Vernon School District*, 837 F.3d 152 (2d Cir. 2016), which involved claims under both disability statutes, the Second Circuit held that "[t]o establish a prima facie case under a disparate impact theory, plaintiff must demonstrate (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." 837 F.3d at 158 (citation and internal quotation marks omitted). The court went on to explain that "plaintiffs are ordinarily required to include statistical evidence to show disparity in outcome between groups," and that "[t]his can be done by offering evidence showing that a neutral policy adversely affects a much greater percentage of people with a disability than it affects people without a disability." *Id.* At least three other circuits have reached similar conclusions. *See, e.g., Roberts v. City of Chicago*, 817 F.3d 561, 566 (7th Cir. 2016) (holding that the complaint failed to state a claim of disparate-impact discrimination under the ADA since it was "devoid of any factual content . . . tending to show that the City's testing process . . . caused a relevant and statistically significant disparity between disabled and non-disabled applicants") (citation and internal quotation marks omitted); *Crawford v. United States Dep't of Homeland Sec.*, 245 F. App'x 369, 381 (5th Cir. 2007) (holding that summary judgment was appropriate on the plaintiff's disparate-impact claim since the plaintiff offered "no valid statistical evidence or analysis regarding the effect of . . . background checks on the employment of disabled individuals"); *Crocker v. Runyon*, 207 F.3d 314, 320 (6th Cir. 2000) (questioning the availability of a disparate-impact claim under the Rehabilitation Act, but noting that statistical evidence would be required to support such claim).

On the other hand, based on the plain language of 42 U.S.C. § 12112(b)(6), which prohibits "employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities," some courts have held that statistical evidence is not required to establish a prima facie case under the "screen out disparate impact theory." *Williams v. ABM Parking Servs.*, No. 1:16-cv-1259, 2017 U.S. Dist LEXIS 182148, at *18 (E.D. Va. Oct. 31, 2017). In *Williams*, the district court noted that "[a]lthough the Fourth Circuit has not ruled on this issue, the Fifth and Ninth Circuits have both recognized that an individual advancing an ADA disparate impact claim need not present statistical evidence if he or she can show that a job qualification screens out the plaintiff on the basis of his or her disability." *Id.* (citing *Gonzales v. City of New Braunfels*, 176 F.3d 834 (5th Cir. 1999)); *see also Bryan v. Wal-Mart Stores, Inc.*, 669 F. App'x 908, 909 (9th Cir. 2016) ("Such discrimination [under the ADA] includes using 'selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities.' To survive a motion to dismiss a disparate impact claim, Bryan must allege a disability, the use of selection criteria, and factual allegations that allow the court to draw a reasonable inference that the selection criteria screens out or tends to screen out Bryan on the basis of his disability.") (quoting 42 U.S.C. § 12112(b)(6)).

In their initial briefing on Patton's disparate-impact claim, both parties relied on Title VII decisions to support their respective arguments. As the foregoing summary indicates, however, the analysis of a disparate-impact claim under the disability statutes is somewhat more nuanced. Indeed, "[t]he handful of courts that have ventured to analyze disparate impact claims under the Rehabilitation Act have candidly observed the endeavor's complexity." *Hale*, 245 F. Supp. 3d at 987 n.3; *see also Anderson*, 20 F. Supp. 3d at 54 ("Because the Rehab Act incorporates the ADA, which is comparable for purposes of disparate impact to Title VII . . . , analyzing Rehab Act claims premised on disparate impact is like unpacking a nesting doll."). Consequently, the court found it appropriate to request supplemental briefing on this claim.

After reviewing all of the materials filed, carefully considering the arguments raised, and examining the relevant case law, the court concludes that Patton has failed to establish a prima facie case of discrimination based on the disparate-impact theory of liability. Generally speaking, disparate-impact claims, including those brought under the ADA and the Rehabilitation Act, involve facially-neutral employment practices that "fall more harshly on one *group* than another." *Raytheon*, 540 U.S. at 52 (emphasis added). Accordingly, for a disparate-impact claim to succeed, a plaintiff is ordinarily required to show that an employment practice had "a significant discriminatory effect on disabled individuals as a group." *Smith v. Miami-Dade Ct*y., 621 F. App'x 955, 961 (11th Cir. 2015); *see also Prewitt v. United States Postal Serv.*, 662 F.2d 292, 310 (5th Cir. 1991) (explaining that, on remand, the plaintiff could establish a prima facie case by proving, among other elements, that the challenged standards had "a disproportionate impact on *persons* having the same handicap from which he suffers") (emphasis added).

Patton has not offered any evidence, statistical or otherwise, demonstrating that the alleged practice of terminating employees based on their use of accrued leave had a disparate impact on disabled employees as a group. Although the record reveals that Amanda Jones and David Prewitt were also terminated for leave-related reasons, Patton has not provided any evidence indicating that they were disabled for purposes of the Rehabilitation Act or that they used leave to accommodate their disabilities.[9] Instead, Patton merely "proffers" that Jones and Prewitt "will validate similar circumstances" at trial. (Pl.'s Br. 19.) Patton's unsupported assertions in this regard do not satisfy her obligations under Rule 56. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party who asserts that a fact is genuinely disputed to support the assertion by "citing to particular parts of materials in the record"). Nor do they support the conclusion that the practice in question had a significant discriminatory effect. *See Smith*, 621 F. App'x at 961 (explaining that "a plaintiff must provide comparative evidence showing that a policy had a

---

[9] Patton did not depose either of these individuals or obtain affidavits from them.

disparate impact on the disabled," and that "[i]it is not sufficient to show that a few people are affected by a policy").

Moreover, under the circumstances of this particular case, the court concludes that the fact that the alleged practice had an adverse effect on a single employee—Patton—is not sufficient to establish the requisite disparate impact. *See id.* ("[Plaintiff's] argument that she was adversely affected by the no-rehire policy is insufficient and does not show a significant discriminatory effect . . . ."). Even if the court were to recognize an exception for claims based on the "screen out disparate impact theory," *Williams*, 2017 U.S. Dist. LEXIS 182148, at *18, this case does not involve the use of "employment tests or other selection criteria," and thus does not implicate the particular provision on which that theory is based. *See* 42 U.S.C. § 12112(b)(6). Indeed, Patton disclaims reliance on such theory in her supplemental brief. *See* Pl.'s Supp'l Br. Opp'n Summ. J. 12, Dkt. No. 72 ("Patton's claim of disparate impact does not relate to tests or selection criteria tending to screen out the disabled; her claim alleges disparate impact from standards and methods of administration that effectively discriminated against three who were already probationary employees (herself, Prewitt, Jones) on the basis of their disabilities.").

For these reasons, the court concludes that Patton has failed to present sufficient evidence to establish a prima facie case of disparate-impact discrimination.[10] The Secretary is therefore entitled to summary judgment on the disparate-impact claim asserted in Count IV.

### III. CONCLUSION

For the reasons set forth above, the Secretary's motion for summary judgment will be GRANTED IN PART AND DENIED IN PART. The case will proceed to trial on the disparate-treatment claim asserted in Count I of Patton's complaint.

---

[10] In light of the court's conclusion, the court finds it unnecessary to address the business-necessity defense asserted by the Secretary.

The clerk is directed to provide a copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered: March 14, 2018.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge